**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **LEON V. BULLOCK,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | )    **No. 2:20-cv-02930-SHM-cgc** |
| | ) |
| **TURNER HOLDINGS, LLC, d/b/a** | ) |
| **PRAIRIE FARMS DAIRY,** | ) |
| | ) |
|     **Defendant.** | ) |
| | ) |
| | ) |
| | ) |

**ORDER**

Plaintiff Leon V. Bullock ("Bullock") brings this action against Defendant Turner Holdings, LLC ("Turner") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. Before the Court is Turner's October 15, 2021 Motion for Summary Judgment ("Turner's Motion"). (D.E. 22.) Bullock filed a response on November 26, 2021. (D.E. 28.) Turner filed a reply on December 10, 2021. (D.E. 29.) For the following reasons, Turner's Motion is **DENIED in part** and **GRANTED in part**.

**I.   Background**

Turner employed Bullock as an Empty Case Handler ("Handler"). (D.E. 28-1 at ¶ 1.) Bullock's job duties included unloading trailers, removing and disposing of old milk from local stores, and maintaining and adjusting machinery. (D.E. 28-1 at

¶ 2.)  On June 15, 2019, while working his night shift, Bullock sustained second- and third-degree chemical burns on his right foot.  (D.E. 28-1 at ¶ 3.)

In September 2019, Bullock's treating wound care physician released him to return to work with a two-week light-duty restriction.  (D.E. 28-1 at ¶ 5.)  Turner assigned him to a temporary maintenance job.  (D.E. 28-1 at ¶ 6.)  At the end of the light-duty period, Bullock was still in pain and was unable to put weight on his right foot.  (D.E. 28-1 at ¶ 7.)  He went on medical leave.  (D.E. 28-1 at ¶ 7.)  In November 2019, Bullock's treating podiatrist released Bullock to return to work with a restriction of "regular duty as tolerated."  (D.E. 28-1 at ¶ 10.)

Bullock returned to work on November 18, 2019.  (D.E. 30-1 at ¶ 3.)  He wore required personal protective equipment, including steel-toe boots.  (D.E. 30-1 at ¶ 3.)  Bullock worked for one-and-a-half hours and performed his job duties.  (D.E. 28-1 at ¶¶ 4, 7.)  Arnett Montague, Bullock's supervisor, then approached Bullock and asked about Bullock's foot injury and limp.  (D.E. 28-1 at ¶ 12.)  Bullock told Montague that Bullock was able to perform his job duties but had to work at a slower pace.  (D.E. 30-1 at ¶ 8.)  Montague sent Bullock home. (D.E. 28-1 at ¶ 12; D.E. 30-1 at ¶ 9.)  Turner asserts that Montague sent Bullock home because Montague did not want Bullock to

2

exacerbate his injury.  (D.E. 28-1 at ¶ 12.)  Bullock asserts that Montague offered different reasons for his decision, including that Bullock was not properly attired.  (D.E. 28-1 at ¶ 12; D.E. 30-1 at ¶ 10.)  The parties ultimately agree that Bullock was sent home because of his foot injury.  (D.E. 28-1 at ¶¶ 12, 13; D.E. 30-1 at ¶¶ 4, 9.)

On November 19, 2019, Bullock went to Melissa Scruggs in Turner's HR Department and asked for documentation about why he had been sent home.  (D.E. 30-1 at ¶ 12.)  During that meeting, Bullock threatened to report Turner to the Equal Employment Opportunity Commission ("EEOC").  (D.E. 30-1 at ¶ 13.)  On November 20, 2019, Bullock received a "Written Warning for Threatening Behavior" from manager Larry Norris. (D.E. 27, Ex. 3.)  Turner asserts that Bullock received the written warning because he was angry during the meeting and raised his voice. (D.E. 28-1 at ¶ 15; D.E. 27, Ex. 3.)

Turner would not allow Bullock to resume work until he had seen a doctor and clarified his work restrictions.  (D.E. 28-19, 310.)  In December 2019, Bullock's workers' compensation doctor referred Bullock to neurologist Dr. Alan Nadel. (D.E. 28-16, 310.)  At Dr. Nadel's initial examination, Bullock complained of severe pain in areas of his foot and difficulty walking. (D.E. 23, 162.)  Dr. Nadel imposed the following restriction: "[Bullock] may work [at] Light Duty.  No steel-toe boot and

3

limited walking." (D.E. 23, 160.)  Dr. Nadel saw Bullock monthly and prescribed several treatments designed to reduce Bullock's pain.  Bullock continued to report pain and difficulty walking.

After an examination in March 2020, Dr. Nadel came to suspect that Bullock's symptoms were "embellishment."  Dr. Nadel referred Bullock for a Functional Capacity Evaluation ("FCE"). (D.E. 28-1 at ¶ 17; D.E. 23, 166.)  Dr. Nadel had the FCE results at the time of his final examination of Bullock on April 7, 2020. According to Dr. Nadel's examination notes, the FCE "showed a lot of inconsistencies in [Bullock's] performance, self-limiting behavior and sub-maximal effort."  (D.E. 23, 172; D.E. 28-1 at ¶ 18.).  The FCE did not substantiate Bullock's major complaints. (D.E. 23, 172; D.E. 28-1 at ¶ 18.)  Dr. Nadel concluded that Bullock had a 1% impairment rating based on Bullock's pain questionnaire.  (D.E. 23, 169.)  After the April 7 examination, Dr. Nadel imposed the following restriction: "Patient has been released from Neurological care.  Patient may return to work at Light Duty, as previously stated." (D.E. 27, 170.)

On April 10, 2020, Scruggs sent Bullock a letter stating, "We have received the final report from Dr. Alan Nadel regarding your [FCE].  You are being released at Maximum Medical Improvement (MMI) at light physical demand level as confirmed in the FCE.  We do not have any permanent light duty positions

4

therefore; we will accept your resignation . . . ." (D.E. 22-3, 128.)

Beginning on April 15, 2020, Bullock had a series of telephone calls with Scruggs. Bullock told Scruggs that Bullock would not resign from the Handler position. (D.E. 30-1 at ¶ 24.) Bullock insisted that he could perform the Handler job duties, but would have to work at a slower pace because of his injury. (D.E. 30-1 at ¶ 24.) He also asked Scruggs about light-duty positions at Turner and was told that he was unqualified for available light-duty positions or that the positions were temporary. (D.E. 28-1 at ¶ 21; D.E. 30-1 at ¶ 25.) Turner later stated on state employment forms that it had terminated Bullock on April 10, 2020. (D.E. 28-9.)

Bullock claims that Turner engaged in disability discrimination when it 1) excluded him from employment after November 18, 2019, and 2) failed to engage in the reasonable accommodation interactive process. (D.E. 8 at ¶¶ 36, 37.) Bullock also claims that Turner retaliated against him after he threatened to report disability discrimination to the EEOC. (D.E. 8 at ¶ 38.) Turner moves for summary judgment on all claims.

## II.  Jurisdiction

The Court has federal question jurisdiction over Bullock's ADA claims under 28 U.S.C. § 1331. Bullock's ADA claims arise under the laws of the United States.

5

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must show that the nonmoving party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of its case. See Fed. R. Civ. P. 56(c)(1); Peeples v. City of Detroit, 891 F.3d 622, 630 (6th Cir. 2018).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'" EEOC v. Ford Motor Co., 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting Chappell v. City of Cleveland, 585 F.3d 901, 913 (6th Cir. 2009)). The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Lossia v. Flagstar Bancorp, Inc., 895 F.3d 423, 428 (6th Cir. 2018) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Allegations or denials in an unverified complaint are not admissible evidence. See King v. Harwood, 852

6

F.3d 568, 578 (6th Cir. 2017). "When reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." Alspaugh v. McConnell, 643 F.3d 162, 168 (6th Cir. 2011)(internal quotations omitted).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut." FDIC v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quotation marks and citations omitted).

## IV. Analysis

### A. Exclusion from Employment

"When an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision . . . the plaintiff has direct evidence of discrimination on the basis of his or her disability." Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 416 (6th Cir. 2020)(quoting Ferrari v. Ford Motor Co., 826 F.3d 885, 892 (6th Cir. 2016)). Under the direct evidence framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion

7

is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 869 (6th Cir. 2007).

Bullock's "exclusion from employment" claim proceeds under the direct evidence framework.[1]  Turner acknowledges that its decision to exclude Bullock from employment after November 18, 2019, relied on Bullock's foot injury.  It argues that Bullock's claim does not satisfy the elements of the direct evidence framework.

### 1.   Disability

To establish a disability under the ADA, a plaintiff must show that he has (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) is regarded as having such an impairment.  See Booth v. Nissan N. Am., Inc., 927 F.3d 387, 393 (6th Cir. 2019) (citing 42 U.S.C. § 12102(1)).

### a.   Limiting Impairment

There is a material issue of fact as to whether Bullock has a physical impairment that substantially limits one or more major life activities.  "Physical impairment" is defined in federal

---

[1] As discussed in Section IV.C.2, infra, Bullock's characterization of his injury as "exclusion from employment" is overbroad. However, the Court adopts Bullock's terminology for the present section because it does not affect the Court's analysis.

8

regulations to include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems . . . ." 29 C.F.R. § 1630.2(h)(1). "Major life activities" include walking. 29 C.F.R. § 1630.2(i)(1)(i). "Substantially limits" is defined in relation to a person's ability to perform a major life activity "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

An impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Id. To evaluate an asserted substantial limitation, a factfinder may consider the manner in which the individual performs the major life activity. See 29 C.F.R. § 1630.2(j)(4). Under the 2008 amendments to the ADA, Congress clarified that the definitions of "disability" and "substantially limits" should be construed broadly in favor of expansive coverage. See 42 U.S.C. § 12102(4)(A),(B); see also 29 C.F.R. § 1630.2(j)(1)(i). The 2008 amendments "invalidate" prior decisions that narrowly defined who qualified as disabled under the ADA. See Morrissey v. Laurel Health Care Co., 946 F.3d 292, 299 (6th Cir. 2019)(declining to apply pre-amendment cases).

In Morrissey, the Sixth Circuit found the plaintiff had submitted sufficient evidence showing that her back issues

substantially limited her ability to walk, stand, lift, and bend. The plaintiff "did not have a specific limitation on the distance she could walk, the amount of time she could stand, the amount of bending she could do, or the amount of weight she could lift." Morrissey, 946 F.3d at 300.  It was enough, however, that after a work shift plaintiff "had difficulty walking, standing, lifting and bending," "had so much trouble bending over that it was difficult to put on her underwear," and "did not walk at all or walked with a slight hunch and a pained expression . . . ." Id.

A reasonable jury could find that Bullock's foot injury was a physical impairment.  There is evidence that Bullock's injury caused pain and affected his neurological system.  (D.E. 28-1 at ¶ 13; D.E. 23, 177.)  A reasonable jury could find that Bullock's injury substantially limited a major life activity.  The facts of this case are similar to those in Morrissey.  There is evidence that Bullock's foot injury made walking painful and difficult.[2] On November 18, 2019, Montague observed Bullock limping at work. Bullock's limp and reported pain were serious enough that Montague decided to send Bullock home.  Dr. Nadel's examination

---

[2] Bullock asserts that his injury also substantially limited his ability to take care of himself, another major life activity. In his unverified Amended Complaint, Bullock says that he is unable to shower without assistance. (D.E. 8 at ¶ 23.) The Court cannot consider allegations in an unverified complaint at the summary judgment stage. See King, 852 F.3d at 578. Bullock does not cite other admissible evidence. The record does not show that Bullock's injury substantially limits his ability to take care of himself.

notes document Bullock's pain and trouble walking.  The notes from the December 2019 examination state, "Gait is slow because of pain in the right foot.  [Bullock] has trouble walking on his toes and heels . . . ."  (D.E. 23, 163.)  Bullock reported "severe dysesthetic pain, particularly when he puts on a shoe or a steel-toe boot." (D.E. 23, 162.)  The notes from the January 2020 examination state that Bullock is "limited in his walking." (D.E. 23, 175.)  The notes from the March 2020 examination state that "[Bullock] walks protecting the right foot and sort of limps or hops."  (D.E. 23, 166.)  The notes from the April 2020 examination state that "[Bullock] walks as if he is severely impaired with his right foot." (D.E. 23, 178.)

Turner argues that Bullock's foot injury could not have been a disability because the FCE did not substantiate Bullock's symptoms and Dr. Nadel eventually concluded that Bullock's symptoms were embellishment.  That argument asks the Court to weigh the FCE findings and Dr. Nadel's conclusions against Bullock's manifest symptoms.  Courts can neither assess credibility nor weigh evidence at the summary judgement stage. See Alspaugh, 643 F.3d at 168

### b.  Regarded as Impaired

There is a material issue of disputed fact as to whether Turner regarded Bullock as impaired.  "[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only

show that their employer believed they had a 'physical or mental impairment,' as that term is defined in federal regulations." Babb v. Maryville Anesthesiologists P.C., 942 F.3d 308, 319 (6th Cir. 2019). "The employer may then rebut this showing by pointing to objective evidence 'that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor.'" Id. (quoting 29 C.F.R. § 1630.15(f)). The ADA defines "transitory impairment" as an impairment with "an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

There is evidence in the record that Turner believed Bullock had a physical impairment. Turner understood that Bullock's foot injury caused him pain. (D.E. 28-1 at ¶¶ 12, 13.) It eventually concluded, based on Dr. Nadel's restrictions, that Bullock's injury limited his ability to walk and made him unqualified to perform Handler duties. Turner has not established that the impairment was or was perceived to be transitory and minor. There is evidence that Bullock's injury effectively kept him from work for more than 10 months.

### 2. Otherwise Qualified

An individual is "otherwise qualified" if he can perform the "essential functions" of the job with or without reasonable accommodations. See 42 U.S.C. § 12111(8). An employer must conduct an individualized inquiry before concluding that an

employee is not qualified.  See Keith v. Cnty. of Oakland, 703
F.3d 918, 923 (6th Cir. 2013); Holiday v. City of Chattanooga,
206 F.3d 637, 643 (6th Cir. 2000).  "A proper evaluation involves
consideration of the applicant's personal characteristics, his
actual medical condition, and the effect, if any, the condition
may have on his ability to perform the job in question." Keith,
703 F.3d at 923.   "Employers do not escape their legal
obligations under the ADA by contracting out certain hiring and
personnel functions to third parties."   Holiday, 206 F.3d at
645.

There is evidence in the record that Bullock was qualified
for the Handler position without an accommodation.  On November
18, 2019, Bullock successfully worked for an hour and a half
before being sent home.  There is also evidence that Bullock was
qualified for the Handler position with an accommodation.   In
conversations with Turner representatives, Bullock said he could
perform Handler job duties, but needed to work more slowly.
Those statements are requests for an accommodation.   They
effectively ask Turner to modify the way the Handler position
was performed.

Turner argues that Dr. Nadel's restrictions prove that
Bullock was not qualified for the Handler position.  The Sixth
Circuit has addressed when an employer may rely on medical
opinions to determine whether an employee is qualified.   In

Holiday, the plaintiff was disqualified from police officer position based on a single doctor's medical report. In "two scribbled lines," the report concluded that the plaintiff could not perform the essential functions of the job because of his HIV-positive status. See Holiday, 206 F.3d at 644. The Sixth Circuit held that the employer did not have a right to rely on the doctor's "unsubstantiated and cursory medical opinion." See id. at 645. The court also emphasized that the plaintiff had introduced evidence showing that he could still perform the essential functions of the job, despite his HIV-positive status. See id. at 644.

In Keith, a deaf plaintiff was denied a lifeguard position because of his disability. After a brief examination of the plaintiff's medical records, the reviewing doctor stated, "He's deaf; he can't be a lifeguard." Keith, 703 F.3d at 924. The Sixth Circuit found that the doctor had not complied with ADA requirements because he "made no effort to determine whether, despite his deafness, [plaintiff] could nonetheless perform the essential functions of the position, either with or without reasonable accommodation." Id.

In Michael v. City of Troy, 808 F.3d 304 (6th Cir. 2015), the plaintiff was disqualified from his police officer position because of psychological issues. One physician examined the plaintiff for more than seven hours and wrote an eleven-page

14

report setting out findings.  See id. at 308.  The physician also considered the City's job description for the position and applied her medical findings to the description before concluding that plaintiff was no longer qualified.  See id.  A second physician examined both the plaintiff and the first physician's report to conclude that the plaintiff was not qualified.  See id.  The Sixth Circuit held that the employer complied with ADA requirements when it relied on the two conclusions.  See id. 307-08.

Dr. Nadel's medical opinion was not unsubstantiated and cursory.  Dr. Nadel examined Bullock four times over four months.  Dr. Nadel's notes from the examinations are detailed and describe Bullock's injury and trouble walking.  Dr. Nadel did not, however, evaluate Bullock with reference to the requirements of Bullock's job.  Other than a brief reference to "steel-toe boots," there is no evidence that Dr. Nadel understood the requirements of the Handler position.  He did not offer an opinion on whether Bullock could work as a Handler.  Instead, Turner was responsible for applying Dr. Nadel's restrictions to the requirements of the Handler position.

Dr. Nadel and Turner both held pieces of the puzzle, but never connected the pieces.  Dr. Nadel had the best understanding of Bullock's physical limitations, but did not understand the requirements of the Handler position.  Turner understood the

15

requirements of the Handler position, but not the effect of Bullock's medical condition on his ability to perform the duties of the job. This case stands in contrast to Michael, where the first physician understood both the plaintiff's limitations and the requirements of the position and concluded that the plaintiff was not qualified. See Michael, 808 F.3d at 308. Because of the disconnect between Dr. Nadel and Turner, a reasonable jury could find that Bullock did not receive the individualized inquiry required under the ADA.

Dr. Nadel's restrictions also appear to contradict his examination notes and the medical evidence. By March 2020, Dr. Nadel suspected that Bullock's symptoms were embellishment. By April 7, Dr. Nadel had access to the FCE report. The FCE report did not substantiate Bullock's complaints. Based on a pain questionnaire, Dr. Nadel concluded that Bullock was not significantly impaired. His April 7 examination notes state, "I recommend that this gentleman return to work at light duty and could return to work based on this [FCE] Report." (D.E. 23, 179)(emphasis added). The examination notes indicate that Bullock could have returned to work without any restrictions. Unlike the medical opinions in Holiday and Keith, there is no suggestion that Dr. Nadel's restrictions were based on biased, unsubstantiated reasoning. On the record for summary judgment, however, the apparent contradiction between the examination

16

notes and medical evidence and Dr. Nadel's restrictions should have raised a red flag for Turner.  Turner had a duty to fully understand Bullock's medical condition and his ability to perform Handler job duties before concluding that Bullock was unqualified.  That duty required Turner to clarify the apparent contradiction.

### B. Interactive Process

Bullock alleges that Turner failed to engage in the ADA's mandatory interactive process to address the accommodation of his disability.  "The duty to engage in the interactive process with a disabled employee is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" Keith, 703 F.3d at 929 (quoting Kleiber, 485 F.3d at 871).  "[F]ailure to engage in the interactive process is only an independent violation if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation."  See Rorrer v. City of Stow, 743 F.3d 1025, 1041 (6th Cir. 2014).  "If the interactive process was triggered but not successfully resolved, courts should attempt to isolate the cause of the breakdown and then assign responsibility." Fisher, 951 F.3d at 421 (internal quotations omitted).  An employer who determines the accommodation it is willing to offer before speaking with the employee does not participate in good faith.  See Mosby-Meachem

17

v. Memphis Light, Gas & Water Div., 883 F.3d 595, 606 (6th Cir. 2018).

Bullock has made a prima facie showing that he requested a reasonable accommodation. On two separate occasions he told Turner representatives that he needed to work more slowly. Turner asserts that working more slowly was not acceptable. (D.E. 30-1 at ¶ 24.) The Court understands Turner to argue that maintaining a certain work pace was an essential function of the Handler position and that Bullock's request for a slower work pace was therefore unreasonable. There is no evidence in the record of the work pace that Handlers needed to maintain. Turner has not established that a certain work pace was an essential function or that a slower work pace an unreasonable accommodation. See Kleiber, 485 F.3d at 869.

There is evidence in the record that Turner did not adequately engage in the required interactive process. A reasonable jury could find that Turner decided what accommodations it was willing to offer before speaking to Bullock. Turner received Dr. Nadel's final restrictions on or about April 7, 2020. On April 10, Turner sent Bullock a letter stating that it had no permanent light-duty positions available and therefore would accept his resignation. Turner did not contact Bullock to discuss accommodations before sending the letter. Turner did discuss potential accommodations with Bullock

18

on or about April 15, 2020.  However, on state employment forms, Turner stated that it had terminated Bullock on April 10, before any discussions took place.

### C. Retaliation

Bullock offers several theories of retaliation.  He claims that he engaged in protected activity when he made a good faith request for reasonable accommodation and when he threatened to report Turner's conduct to the EEOC.  He claims that he suffered adverse action when he received a written warning for threatening behavior and when he was excluded from employment after November 18, 2019.

The parties agree that Bullock's retaliation claims should be analyzed using the burden-shifting framework articulated in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) he engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action.  See Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 419 (6th Cir. 2021); Ford Motor Co., 782 F.3d at 767.  Once a plaintiff establishes a prima facie case, the defendant has the burden to articulate a nonretaliatory reason for its action.  See EEOC v. New Breed Logistics, 783 F.3d 1057,

1066 (6th Cir. 2015).  If the defendant meets its burden, a plaintiff must prove the given reason is a pretext for retaliation.  See Wyatt, 999 F.3d at 419-420; Ford Motor Co., 782 F.3d at 767.

### 1.  Protected Activity

Turner argues that there is no protected activity in this case because Bullock filed an EEOC charge only after his employment at Turner had ended.  That argument overlooks other forms of protected activity.  Requesting an accommodation for a disability and threatening to file an EEOC charge are both examples of protected activity for the purposes of an ADA retaliation claim.  See LeMarbe v. Vill. of Milford, No. 19-12992, 2021 WL 4972946, at *14 (E.D. Mich. Oct. 26, 2021)(denying defendant's summary judgment motion where plaintiff had requested an accommodation and threatened to file an EEOC charge). The Sixth Circuit has noted that "this circuit and most others agree that requests for accommodation are protected acts." A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 698 (6th Cir. 2013).  Bullock engaged in protected activity when he requested a reasonable accommodation and when he threatened to report Turner to the EEOC for disability discrimination.

### 2.  Causation

Turner argues that Bullock has failed to establish a causal connection between protected activity and adverse employment

action.    Turner  emphasizes  that  Bullock  was  terminated  five
months after he threatened to report Turner to the EEOC.  Bullock
argues  that  the  adverse  action  in  this  case  includes  more  than
his  ultimate  termination.    He  asserts  that  his  November  20
written  warning  and  general  exclusion  from  employment  after
November 18, 2019, also constitute adverse actions.

In  the  retaliation  context,  an  adverse  action  is  an  event
that would "dissuade  a  reasonable  person  from  engaging  in  the
protected  activity."    Hurtt v. Int'l Servs., Inc., 627 F. App'x
414, 423 (6th Cir. 2015).    The November 20 written warning did
not  constitute  an  adverse  action.    A  single  written  warning,
without  other  consequences,  would  not  dissuade  a  reasonable
person  from  engaging  in  protected  activity.    Cf.  Zanders  v.
Potter,  223  Fed.  App'x  470  (6th  Cir.  2007)  (affirming  the
district  court's  conclusion  that  a  letter  of  warning  did  not
establish a prima facie case of discrimination); Rio v. NHC/OP,
L.P.,  149  F.  Supp.  3d  839,  845  (M.D.  Tenn.  2016)  (finding  that
a  no-call  no-show  disciplinary  write-up  failed  to  qualify  as  a
materially  adverse  action).

Other than his actual termination, Bullock's exclusion from
employment  after  November  18,  2019,  does  not  constitute  an
adverse  action.    Turner  required  that  Bullock  visit  a  doctor  and
clarify  his  restrictions  before  returning  to  work.    The  Sixth
Circuit  has  held  that  an  employer  may  condition  an  employee's

return to work on successful completion of a legitimate medical exam.  See Gipson v. Tawas Police Auth., 794 F. App'x 503, 508 (6th Cir. 2019)(holding that plaintiff did not suffer an adverse action when his employer required that he undergo an FCE before returning from leave); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 813 (6th Cir. 1999)("This court has upheld requiring mental and physical exams as a precondition to returning to work.").  The Handler position requires frequent walking and physical exertion.  Turner was entitled to condition Bullock's return to work on successful clarification of his restrictions.  That Turner, with one exception, continued to pay Bullock during the leave period also demonstrates that Bullock's exclusion from employment did not constitute an adverse action.

Bullock claims that he suffered an adverse action when Turner did not pay him for the two weeks after he was sent home.  During that two-week period, Bullock was essentially on medical leave.  Bullock has not submitted evidence that he was entitled to full pay while on medical leave.  The Court cannot conclude that Turner's failure to pay Bullock for those two weeks constituted an adverse action.

"[A]n inference of causation may arise solely from the closeness in time between the point at which an employer learns of an employee's protected activity and the point at which it takes an adverse action against that employee." Kirilenko-Ison

v. Bd. of Educ. of Danville Indep. Sch., 974 F.3d 652, 664 (6th
Cir. 2020). The Sixth Circuit has found that a three-month delay
between protected activity and adverse action is insufficient to
create a genuine dispute on the matter of causation. See Barlia
v. MWI Veterinary Supply, Inc., 721 F. App'x 439, 451 (6th Cir.
2018). Bullock's protected activity consisted of his requests
for accommodation on or about November 18, 2019, and April 15,
2020, and his threat to report Turner to the EEOC on November
19, 2019. He suffered an adverse action when he was terminated
on April 10, 2020. Five months passed between Bullock's November
2019 protected activity and his termination. There is no
evidence that his November protected activity caused his
termination. Bullock's April 2020 protected activity occurred
after his termination and could not have caused the termination.
Bullock has not satisfied the causation element of his prima
facie case.

### 3. Pretext

Turner argues that Bullock's retaliation claim fails on the
issue of pretext. Turner has articulated a nondiscriminatory
reason for its termination of Bullock: Bullock was unable to
perform essential job functions. Bullock disagrees and asserts
he was able to perform the essential job functions, with or
without an accommodation. "To demonstrate pretext, a plaintiff
must show both that the employer's proffered reason was not the

real reason for its action, and that the employer's real reason was unlawful." Ford Motor Co., 782 F.3d at 767.  Bullock makes a passing reference to the fact that Montague offered shifting rationales for sending Bullock home on November 18, 2019. However, Bullock does not adequately show that Turner's proffered reason was not the true reason for his termination or that Turner terminated him for retaliatory reasons.  Bullock's retaliation claim also fails on the issue of pretext.

V.   **Conclusion**

Turner's Motion is **DENIED in part** and **GRANTED in part**.  The Motion is **DENIED** on the exclusion-from-employment and interactive process claims.  The Motion is **GRANTED** on the retaliation claim.  That claim is **DISMISSED**.

SO ORDERED this 27th day of January, 2022.


/s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE